**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**DEBORAH DONOGHUE,**

Plaintiff,

– v. –

**ICONIX BRAND GROUP, INC.,**

Nominal Defendant,

– and –

**MONECOR (LONDON) LIMITED**
**(TRADING AS ETX CAPITAL,**

Defendant.

**ECF CASE**

**17 CIVIL 10083 (AJN)**

**MEMORANDUM OF LAW**
**IN SUPPORT OF SETTLEMENT APPROVAL**
**AND OF AWARD OF ATTORNEYS' FEES & DISBURSEMENTS**

**David Lopez**
**171 Edge of Woods Road**
**P.O. Box 323**
**Southampton, New York 11969-0323**

**Miriam Tauber**
**885 Park Avenue, # 2A**
**New York, New York 10075**

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................iv

OVERVIEW ...........................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.  THE COURT MUST DETERMINE THE ADEQUACY AND FAIRNESS OF THE
    SETTLEMENT ONLY TO THE EXTENT NECESSARY TO ENSURE
    DILIGENT PROSECUTION OF THE LITIGATION ....................................................2

    A.  A Section 16(b) Suit Is Not a "Derivative Action" Within the Meaning of
        Rule 23.1 or Local Civil Rule 23.1.1 ................................................................2

    B.  The Court Should Approve the Settlement Agreement as "Diligent[] . . .
        Prosecut[ion]" of the Company's Section 16(b) Rights........................................5

II. SHAREHOLDER NOTICE OF THE PROPOSED SETTLEMENT AGREEMENT
    IS NOT NECESSARY UNDER THE CIRCUMSTANCES OF THIS CASE .................7

    A.  Notice is Not Required
        Under Rosen v. Price and Precedents Decided Post-Rosen ..................................7

    B.  Rosen's Holding That Shareholder Notice Is Not Always Required Is
        Consistent with Circuit Court Guidance and the Text of Rule 23.1 .....................9

III. ASSUMING THE GRINNELL FACTORS APPLY, THEY SUPPORT THE
     FAIRNESS, ADEQUACY, AND REASONABLENESS OF THE SETTLEMENT ......10

    A.  The Negotiating Process Entitles the Settlement Agreement to a
        Presumption of Fairness, Adequacy, and Reasonableness..................................12

    B.  The Terms of the Settlement Agreement Satisfy the Substantive Grinnell
        Factors ............................................................................................................12

        1.  Grinnell Factor One: The Complexity, Expense, and Likely
            Duration of Litigation .........................................................................12

        2.  Grinnell Factor Three: The Stage of the Proceedings and Extent of Discovery ...14

        3.  Grinnell Factors Four and Five: The Risks of Establishing Liability
            and Damages .......................................................................................15

        4.  Grinnell Factors Eight and Nine: The Reasonableness of the Settlement
            Fund in Light of the Best Possible Recovery and in Light of All the
            Attendant Risks of Litigation ...............................................................16

5. *Grinnell* Factor Seven: The Ability of the Defendants to Withstand a Greater Judgment ................................................................................17

6. The Congressional Purpose to Cause Disgorgement of Short-Swing Trading Profits ................................................................................17

IV. THE LEGAL FEES AND DISBURSEMENTS AGREED TO ARE FAIR AND REASONABLE ................................................................................19

A. The Agreement Between Plaintiff's Counsel and Iconix Should Be Given Deference ................................................................................19

B. Applicable Standards ................................................................................19

1. Benefit Conferred ................................................................................20

2. Contingent Nature of the Fee and Risks of Litigation ....................................21

3. Magnitude and Complexity of the Action ....................................................21

4. Quality of Representation ................................................................................21

5. The Lodestar Approach ................................................................................22

6. Public Policy ................................................................................25

CONCLUSION ................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Access Now, Inc. v. AMH CGH, Inc.*,
    No. 98-3004-CIV, 2001 U.S. Dist. LEXIS 12876 (S.D. Fla. May 8, 2001) .........................9

*Bano v. Union Carbide Corp.*,
    273 F.3d 120 (2d Cir. 2001) ..........................................................................................21

*Bello v. Integrated Resources, Inc.*,
    No. 88 Civ. 1214(CSH), 1990 WL 52087 (S.D.N.Y. April 19, 1990) .............................21

*Blau v. Mission Corp.*,
    212 F.2d 77 (2d Cir. 1954) ............................................................................................3

*Blau v. Oppenheim*,
    250 F. Supp. 881 (S.D.N.Y. 1966).................................................................................4

*Chechele v. Elstain*,
    No. 11-cv-3320 (SAS), 2012 WL 607448 & 2012 WL 12358221
    (S.D.N.Y. Feb. 24, 2012 & Aug. 1, 2012).............................................................passim

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 488 (2d Cir. 1974) .........................................................................................passim

*Conley v. Sears, Roebuck & Co.*,
    222 B.R. 181 (D. Mass. 1998) ......................................................................................24

*Continental Illinois Securities Litigation*,
    962 F.2d 566 (7th Cir. 1992) .........................................................................................23

*Denney v. Jenkens & Gilchrist*,
    230 F.R.D. 317 (S.D.N.Y. 2005) ..................................................................................11

*DiLorenzo v. Edgar*,
    No. Civ. 03-841-SLR, 2004 WL 609374 (D. Del. Mar. 24, 2004)...................................17

*Donoghue v. CSX Corp.*,
    No. 08 Civ. 9252 (MGC), 2009 U.S. Dist. LEXIS 97086
    (S.D.N.Y. Mar. 9, 2009)...............................................................................................2

*Evans v. Jeff D.*,
    475 U.S. 717 (1986) .....................................................................................................19

*FTR Consulting Group, Inc. v. Advantage Fund II, Ltd.*,
    No. 02 Civ. 8608 (RMB),
    2005 U.S. Dist. LEXIS 20013 (S.D.N.Y. Sept. 13, 2005) ...............................................11

*Gollust v. Mendell,*
    501 U.S. 115 (1991) ............................................................... 3, 5, 15

*Greco v. Local.com,*
    806 F. Supp. 2d 653 (S.D.N.Y. 2011) ......................................... 3, 6-7

*Green v. American Express Co.,*
    200 F.R.D. 211 (S.D.N.Y. 2001) ..................................................... 9

*Gryl v. Shire Pharmaceuticals Group PLC,*
    298 F.3d 136 (2d Cir. 2002) ............................................................ 4

*In re Agent Orange Products Liability Litigation,*
    818 F.2d 226, 236 (2d Cir. 1987) ............................................ 20, 22

*In re Allister Insurance Securities Litigation,*
    No. 88 Civ. 9282 (PKL), 12991 U.S. Dist. LEXIS 20402 (S.D.N.Y. Nov. 20, 1991) ........ 21

*In re AOL Time Warner Shareholder Derivative Litigation,*
    No. 02 Civ. 6302 (SWK), 2006 U.S. Dist. LEXIS 63260 (S.D.N.Y. Sept. 6, 2006) ........... 11

*In re Beverly Hills Litigation,*
    639 F. Supp. 915 (E.d. Ky. 1986) .................................................. 24

*In re Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*
    778 F.2d 890 (1st Cir. 1985) ........................................................ 24

*In re Global Crossing Securities & ERISA Litigation,*
    225 F.R.D. 436 (S.D.N.Y. 2004) ................................................... 14

*In re Gulf Oil/Cities Service Tender Offer Litigation,*
    142 F.R.D. 588 (S.D.N.Y. 1992) ................................................... 21

*In re IMAX Securities Litigation,*
    No. 06 Civ. 6128 (NRB), 2012 U.S. Dist. LEXIS 86513 (S.D.N.Y. June 20, 2012) .......... 14

*In re IPO Securities Litigation,*
    260 F.R.D. 81 (S.D.N.Y. 2009) ................................................ 10, 11, 13, 17

*In re Mercury Interactive Corp. Derivative Litigation,*
    487 F. Supp. 2d 1132 (N.D. Cal. 2007) ........................................... 17

*In re New York City Municipal Securities Litigation,*
    No. 314-MDL-21-22, 1984 WL 23411 (S.D.N.Y., Mar. 28, 1984) .................. 23

*In re Sony SXRD Rear Projection Television Class Action Litigation,*
    No. 06 Civ. 5173 (RPP), 2008 U.S. Dist. LEXIS 36093 (S.D.N.Y. May 1, 2008) ............ 14

*In re Telik, Inc. Securities Litigation*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................... 11

*In re Veeco Instruments Securities Litigation*,
    No. 05 MD-La 1695 (CM), 2007 U.S. Dist. LEXIS 85629 (S.D.N.Y Nov. 7, 2007) ......... 16

*In re Warner Communications Securities Litigation*,
    618 F. Supp. 735 (S.D.N.Y. 1985) ................................................................ 23

*Koster v. (American) Lumbermens Mutual Casualty Co.*,
    330 U.S. 518 (1947) ..................................................................................... 5

*Lawrence v. Graubard Miller*,
    11 N.Y.3d 588 (N.Y. Ct. App. 2008) ............................................................ 21

*Levy v. GE Capital Corp.*,
    No. 99 Civ. 10560 (AKH),
    2001 U.S. Dist. LEXIS 13099 (S.D.N.Y. Aug. 30, 2001) ............................ 17-18

*Lewis v. Rosenberg*,
    No. 120-12, 1958 U.S. Dist. LEXIS 4187 (S.D.N.Y. Apr. 11, 1958) ..................... 6

*Malchman v. Davis*,
    761 F.2d 891 (2d Cir. 1985) ........................................................................ 19

*Maley v. Del Global Technologies Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) ............................................................ 14

*Mendell v. Gollust*,
    909 F.2d 724 (2d Cir. 1990) ..................................................................... 3, 5

*Morales v. New Valley Corp.*,
    999 F. Supp. 470 (S.D.N.Y. 1999) ................................................................ 8

*Pino v. Pocasio*,
    101 F.3d 285 (2nd Cir. 1996). ...................................................................... 23

*Polar International Brokerage Corp. v. Reeve*,
    187 F.R.D. 108 (S.D.N.Y. 1999) .................................................................. 10

*Rosen v. Price*,
    No. 95 Civ. 5089 (CSH), 1998 U.S. Dist. LEXIS 9198 (S.D.N.Y. June 23, 1998) .............. 7

*Rosenberg v. XO Communications, Inc.*,
    330 B.R. 394 (Bankr. S.D.N.Y. 2005) ....................................................... 3, 5-7

*Schaffer v. CC Investments LDC*,
    286 F. Supp. 2d 279 (S.D.N.Y. 2003) ......................................................... 4-5

*Schaffer v. Soros*,
   No. 92 Civ. 1233 (LMM), 1994 WL 381442 (S.D.N.Y. July 20, 1994)............................21

*Simmonds v. Credit Suisse Securities (USA) LLC*,
   Nos. 09-35262 et al., 2011 U.S. App. LEXIS 974 (9th Cir. Jan. 18, 2011) .........................4

*Volk v. Zlotoff*,
   285 F. Supp. 650 (S.D.N.Y. 1968) ....................................................................................6

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005) ............................................................................................10

*Weiss v. Mercedes Benz Inc.*,
   899 F. Supp. 1297 (D.N.J. 1995) ...................................................................................24

## Statutes & Rules

15 U.S.C. § 78p(b)......................................................................................................passim

31 U.S.C. § 3730(b)..........................................................................................................5

Fed. R. Civ. P. 23 ......................................................................................................passim

## Other Authorities

Hazen, Thomas Lee,
   Law of Securities Regulation (6th ed. 2010) ....................................................................4

Ellen M. Ryan & Laura E. Simmons, Cornerstone Research,
   Securities Class Action Settlements: 2011 Review and Analysis (2012) .........................16

Peter J. Romeo & Alan L. Dye,
   Section 16 Deskbook (Spring 2011) .................................................................................9

Peter J. Romeo & Alan L. Dye,
   Section 16 Treatise and Reporting Guide (4th ed.)........................................... 6, 12, 14, 21

# OVERVIEW

This is a shareholder suit brought under Section 16(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. 78p(b), to recover short-swing profits on behalf and for the benefit of the Nominal Defendant, Iconix Brand Group, Inc. ("ICONIX") from defendant Monecor (London) Limited (trading as ETX Capital) ("MONECOR"). An arms-length settlement has been reached between MONECOR and Plaintiff Deborah Donoghue ("Plaintiff") with counsel to ICONIX fully apprised and participating in the negotiations. A fee agreement was reached with ICONIX by Plaintiff's counsel subsequent to substantive settlement. All agreements of the parties, including the settlement agreement (the "Settlement Agreement"),are subject to court approval.

The substantive settlement provides for payment by MONECOR to ICONIX, of $350,000 less legal fees and costs as approved by the court. The fee agreement between ICONIX and Plaintiff's counsel and MONECOR is for payment by MONECOR to Plaintiff's counsel on behalf of ICONIX of such fees and costs as the Court may award. As is typical of settlements like this, MONECOR has agreed to make these payments without admitting liability, and the parties have agreed to exchange mutual releases.

This memorandum has four sections. Section I urges that Federal Rule of Civil Procedure 23.1 does not apply to Section 16(b) cases and asks the Court to approve the settlement as "diligently . . . prosecut[ed]," the only relevant standard under the text of the statute. Sections II and III demonstrate that even if the Court decides that Rule 23.1 applies, the Settlement Agreement can be approved without further notice because it easily satisfies the standards for fairness, adequacy, and reasonableness established by the Second Circuit. Section IV is an application for the award of fair and reasonable fees to Plaintiff's counsel. Accordingly,

the parties respectfully ask the Court to approve their Settlement Agreement and their agreement on attorneys' fees.

## ARGUMENT

## I.  THE COURT MUST DETERMINE THE ADEQUACY AND FAIRNESS OF THE SETTLEMENT ONLY TO THE EXTENT NECESSARY TO ENSURE DILIGENT PROSECUTION OF THE LITIGATION

A Section 16(b) suit is not a derivative action.  Although "quasi-derivative" in function, the private right conferred by Section 16(b) is just that: a private right belonging to a shareholder personally.  The parties submit the Stipulation of Settlement for approval not because the law requires it but because approval is necessary to give the settlement preclusive effect, as Section 16(b) only authorizes a securityholder to bring suit when her or his claim has not otherwise been "diligently . . . prosecute[d]."  15 U.S.C. § 78p(b).  The Court should hold that the Stipulation of Settlement represents diligent prosecution preclusive of further litigation.

### A.  A Section 16(b) Suit Is Not a "Derivative Action" Within the Meaning of Rule 23.1 or Local Civil Rule 23.1.1

Federal Rule of Civil Procedure 23.1 provides that a "derivative action" may not be settled without shareholder notice and court approval.  Fed. R. Civ. P. 23.1(c).  Because the rule does not define the term "derivative action," this Court must decide the threshold question of whether this case is a "derivative action" within the meaning of the rule.

Many opinions casually refer to Section 16(b) suits as "derivative."  *See, e.g.*, *Gryl v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 139 (2d Cir. 2002) ("The plaintiffs filed this stockholder derivative action . . . .").  This Court has even held fairness hearings for Section 16(b) settlements under Rule 23.1.  *See, e.g.*, *Donoghue v. CSX Corp.*, No. 08 Civ. 9252 (MGC), 2009 U.S. Dist. LEXIS 97086 (S.D.N.Y. Mar. 9, 2009).  But none of these cases carefully considered whether a Section 16(b) suit is a "derivative action" for purposes of Rule 23.1.  "It appears that

references to [the] phrase 'derivative action' in these cases . . . are generally descriptive and not germane to the issues decided therein, and not a finding of the nature of a Section 16(b) cause of action for purposes of enforcement." *Rosenberg v. XO Commc'ns, Inc.*, 330 B.R. 394, 428 n.24 (Bankr. S.D.N.Y. 2005).

The few authorities that have squarely addressed the question have uniformly concluded that a Section 16(b) case is not a "derivative action" for purposes of Rule 23.1. *See id.* ("[W]hile certain cases refer to a Section 16(b) suit as a derivative suit, any case that has analyzed the issue has 'concluded that a Section 16(b) suit is not a derivative action.'") (quoting Arnold S. Jacobs, Section 16 of the Securities Exchange Act § 3:35 at 3-290 (West, July 2003)). These authorities have rejected Rule 23.1(b)(1)'s contemporaneous ownership requirement. *See Blau v. Mission Corp.*, 212 F.2d 77, 79 (2d Cir. 1954). They have also dispensed with Rule 23.1(a)'s requirement of adequate representation. *See Greco v. Local.com*, 806 F. Supp. 2d 653, 658 n.1 (S.D.N.Y. 2011). Indeed, they do not require the plaintiff to be a shareholder at all. *See Gollust v. Mendell*, 501 U.S. 115, 123 (1991) ("Any security will suffice . . . ." (internal quotation marks and citation omitted)). Judge Scheindlin's opinion of August 1, 2012, in *Chechele v. Elstain*, 11 Civ. 3320 (S.D.N.Y.), squarely on point, appears at Exhibit A to the affirmation of David Lopez in support of this motion. *See also id.* at 2012 WL 12358221.

The Second Circuit's opinion in *Gollust* gave perhaps the clearest rejection of the relevance of Rule 23.1. The Court surveyed at some length the differences between the standing requirements of Rule 23.1 and Section 16(b). *See Mendell v. Gollust*, 909 F.2d 724, 728-29 (2d Cir. 1990). It then went out of its way to distinguish a precedent from this Court that had relied on Rule 23.1. *See id.* at 730 (discussing *Rothenberg v. United Brands Co.*, [1977-78] Fed. Sec. L. Rep. (CCH) ¶ 96,045, at 91,691-92 (S.D.N.Y.), *aff'd mem.*, 573 F.2d 1295 (2d Cir. 1977)).

The Second Circuit criticized *Rothenberg* as "premised on an analogous application of Rule 23.1 which ... does not govern shareholders bringing § 16(b) claims." *Id.* The Supreme Court of the United States affirmed. *Gollust*, 501 U.S. 115.

Many authorities have joined *Gollust* in rejecting the characterization of Section 16(b) suits as "derivative actions." *See, e.g.*, *Simmonds v. Credit Suisse Secs. (USA) LLC*, Nos. 09-35262 et al., 2011 U.S. App. LEXIS 974, at *15-16 n.7 (9th Cir. Jan. 18, 2011) ("Certain courts and commentators have suggested that Section 16(b) actions are not true derivative actions." (citing *Dottenheim v. Murchison*, 227 F.2d 737, 738 (5th Cir. 1956); *Schaffer v. CC Invs., LDC*, 286 F. Supp. 2d 279, 281-82 (S.D.N.Y. 2003); 4 Thomas Lee Hazen, Law of Securities Regulation § 13.2 n.41 (6th ed. Supp. 2010); Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide § 9:03[1][a] (3d ed. 2008))); *see also Blau v. Oppenheim*, 250 F. Supp. 881, 885 (S.D.N.Y. 1966) ("[S]trictly speaking a section 16(b) suit to recover short-swing profits is not derivative, although some of the cases so describe it").

This Court in *Schaffer* thoroughly articulated the rationale for distinguishing between Section 16(b) cases and true derivative actions. As Judge Marrero explained, the two sets of suits have "some similarities" but "differ in more fundamental ways":

> First, a § 16(b) cause of action is a statutory enabling right directly empowering the shareholder to sue; it is not a derivative or secondary right grounded on rights and interests possessed primarily by the corporation and emanating from common law. In other words, the § 16(b) action amounts to an *enforcement* right that, if successful, enables the corporation to gain from the redistribution of insiders' illicit profits to which the corporation had no right of recovery under common law causes of action.

> Furthermore, as reflected in the plain language of the statute, § 16(b) was enacted because of the "national public interest which makes it necessary to provide for regulation and control of such transactions." By contrast, the underlying scope and purposes of the pure derivative cause of action serve broader objectives. Such an action enables the shareholder to prosecute a broader range of wrongdoing by corporate officers or agents committed against the corporation on the basis of recognized causes of action the corporation itself would have under

the common law, and thereby to vindicate more extensive rights and interests on behalf of the corporation.

*Schaffer*, 286 F. Supp. 2d at 282 (original emphasis, citations omitted); *see also XO Commc'ns*, 330 B.R. at 428 n.24 (thorough analysis of same issue, endorsing *Schaffer*).

Although *Schaffer* addressed a question of bankruptcy law, its logic applies to Rule 23.1 as well. A true derivative suit owes its life to the courts: "The stockholder's derivative action . . . is an invention of equity to supply the want of an adequate remedy at law to redress breaches of fiduciary duty by corporate managers." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522 (1947). Having conceived this procedural device, the courts may employ it as they see fit, superintending it through Rule 23.1 and otherwise.

By contrast, a securityholder's right to recapture short-swing profit on behalf of a public issuer does not come from the courts. It comes from Congress, having an express statutory origin. And nothing in the text of that statute limits the securityholder's right to enforce the statute by requiring court approval of a settlement. Congress knew how to limit the right if it wanted to, as it has done with other statutes. *See, e.g.*, 31 U.S.C. § 3730(b) (requiring an action under the False Claims Act to be "brought in the name of the Government" and "dismissed only if the court and the Attorney General give written consent to the dismissal"). Absent analogous statutory language, the approval requirement should not be grafted onto the text of Section 16(b)

**B.** **The Court Should Approve the Stipulation of Settlement as "Diligent[] ... Prosecution" of the Company';s Section 16(b) Rights.**

Grafting Rule 23.1 onto Section 16(b) is especially unwarranted because Section 16(b) already has a mechanism for protecting the issuer's stakeholders and ensuring finality. The plain terms of the statute permit a securityholder to sue on the issuer's behalf "if the issuer shall fail or refuse to bring such suit within sixty days after request *or shall fail diligently to prosecute the same thereafter*." 15 U.S.C. § 78p(b) (emphasis added). The issuer's execution of a

settlement agreement cannot preclude follow-on litigation unless the court presiding over it concludes that the settlement agreement amounted to "diligent[] . . . prosecut[ion]" of the claim. *Cf. Lewis v. Rosenberg*, No. 120-12, 1958 U.S. Dist. LEXIS 4187, at *2 (S.D.N.Y. Apr. 11, 1958) (explaining that stockholder intervention under Section 16(b) is permissible, notwithstanding noncompliance with then-Rule 23(b), if "the corporation has failed diligently to prosecute its claim"). Since the statute already has a homologous "fairness" standard — diligent prosecution — there is no need to saddle Section 16 with the judicially crafted standards of Rule 23.1.

The parties have submitted the Settlement Agreement for approval to ensure that the diligent prosecution standard is satisfied. If the Court adjudges that the settlement culminates a "diligent[] . . . prosecut[ion]" of this Section 16(b) claim, then the Court's judgment will be res judicata preclusive of further litigation. The preclusive effect is not because of anything in Rule 23.1 (which applies only to true "derivative action[s]") but because a securityholder has no right to relitigate a Section 16(b) claim that has already been "diligently prosecute[d]." *See Volk v. Zlotoff*, 285 F. Supp. 650, 657 (S.D.N.Y. 1968) ("The settlement by a corporation of a Section 16(b) claim against an insider for an inadequate amount will not preclude an action by a shareholder."); *Lewis*, 1958 U.S. Dist. LEXIS 4187, at *2.

The term "diligent prosecution" implies that the Court's inquiry should focus on the process leading to settlement rather than the substantive settlement terms. That approach dovetails well with the statutory text, with this Court's precedent on reopening Section 16(b) litigation, and even with the Court's analogous precedent under Rule 23.1. *See Local.com*, 806 F. Supp. 2d at 659 (finding Section 16(b) judgment preclusive of subsequent litigation because prior litigant had "vigorously prosecuted her claim . . . throughout the litigation"); *id.* at 658-59

& n.1 (observing that vigorous prosecution is a hallmark of adequate representation under Rule 23.1, while recognizing that Rule 23.1 is not "directly applicable" to Section 16(b) (internal quotation marks omitted)). As discussed *infra* in Section III.A, the parties' settlement — negotiated at arm's length — satisfies that standard.

## II. SHAREHOLDER NOTICE OF THE PROPOSED SETTLEMENT AGREEMENT IS NOT NECESSARY UNDER THE CIRCUMSTANCES OF THIS CASE

### A. Notice is Not Required Under *Rosen v. Price* and Precedents Decided Post-*Rosen*

Whether or not the Court agrees that a Section 16(b) case is not a "derivative action" for purposes of Rule 23.1, it may avoid that question and still hold that notice is not required in this case. In *Rosen v. Price*, No. 95 Civ. 5089 (CSH), 1998 U.S. Dist. LEXIS 9198, at *3 (S.D.N.Y. June 23, 1998), the Court was asked to approve a Section 16(b) settlement. It started its analysis with the premise that because the lawsuit was "a derivative action by a shareholder, it falls under Rule 23.1." *Id.* at *1-*2. But the Court went on to express doubt over whether Rule 23.1 applies to Section 16(b) cases, *id.* at *3, observed that other courts in the Southern District of New York had "dispensed with the giving of notice under Rule 23.1" in Section 16(b) cases, *id.* (citing *Plaskow v. Peabody Intl. Corp.*, 95 F.R.D. 297, 299 (S.D.N.Y. 1982) (in turn citing *Blau v. Berkeley & Berkeley Photo, Inc.*, CCH Fed. Sec. L. Rep. ¶ 92,264 (1967-1969 Decisions) (S.D.N.Y. 1968)), and held that dispensing with notice was appropriate under the circumstances, *id.* at *3-4.

*Rosen* did not require shareholder notice because it determined that the interests of the issuer's shareholders would "not be substantially affected by the [settlement]." *Id.* at *3. The issuer had assets of nearly $1.1 billion and shareholder equity of more than $1.1 billion, while the settlement called for disgorgement of only $450,000. *Id.* The Court deemed notice unnecessary because the settlement was miniscule in comparison to these numbers. *Id.* at *4.

Here, ICONIX's total assets at June 30, 2018, was $730,185,000 while the amount of recovery is projected at $350,000 or roughly 0.48.% of that number.

The Court's docket records show that approval of settlements without shareholder notice is unexceptional. Since *Rosen*, the Court has approved the compromise or voluntary dismissal of at least seven Section 16(b) cases without notice to shareholders[1] prior to 2015. Since Plaintiff's counsel found these cases by searching the dockets (or having prosecuted them) in matters for which opinions have been publicly reported, that number probably understates significantly the true number of such dispositions.

Three cases have been brought to settlement and dismissal by Plaintiff's counsel since 2015, in this District using the procedure for which this brief advocates: *Donoghue v. RA Capital*, No. 14-CV-8353 (Crotty, J.); *Donoghue v. Shkreli et al.*, No. 14-cv-7640 (Ramos, J.); and *Donoghue v. Northwest BioTherapeutics, Inc.*, No. 15-cv-1492 (Failla, J.). These cases involved tens of millions of dollars in total recoveries and millions of dollars in attorneys' fees.

This Court should conclude that notice to ICONIX's shareholders is not required, just as other judges in this District have concluded. *Cf. Schaffer v. SC Fundamental Inc.*, 98 Civ. 1127 (RCC), Doc. Nos. 13-14 (S.D.N.Y. filed Feb. 18, 1998) (approving 16(b) settlement

---

[1] Stipulation and Order of Dismissal with Prejudice, *Goldstein v. QVT Assocs. GP LLC,* No. 10-cv-2488 (HB)(AJP) (S.D.N.Y. Feb. 3, 2011); Stipulation and Order of Dismissal [Doc. No. 30] *Donoghue v. Golden State Bancorp.,* No. 02-cv-2404 (TPG) (S.D.N.Y. Aug. 4, 2006); Mandate Withdrawing Appeal, *Schaffer v. Litzler*, No. 02-cv-6313 (AKH) (S.D.N.Y., May 5, 2006) ("[T]he appeal is hereby withdrawn pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure ...."); Notice of Voluntary Dismissal [Doc. No. 18], *Morales v. Auspex Sys., Inc.,* No. 00-cv-1173 (KMW) (S.D.N.Y., June 6, 2001); Notice of Voluntary Dismissal (Doc. No. 32] *Morales v. Adept Tech. Inc.*, No. 00-cv-957 (LMM) (S.D.N.Y. May 29, 2001); Stipulation and Order of Voluntary Dismissal [Doc No. 23]; *Strauss v. Kopp Inv.*, No. 98-cv-7493 (MP) 1246 (CSH) (S.D.N.Y.) Mar. 16, 1999).

involving disgorgement of $850,000 and a fee of $283,333, without requiring shareholder notice); *Morales v. New Valley Corp.*, 999 F. Supp. 470 (S.D.N.Y. 1999) ("In the circumstances of this case, notice to shareholders will not be required in this application for attorneys' fees [of $525,000], also, no such hearing or notice as set forth in Local Rule 23.1 is required in this application.").

**B.    Dispensing With Shareholder Notice Is Discretionary**

The Court should exercise its discretion to dispense with notice. *Cf. Access Now, Inc. v. AMH CGH, Inc.*, No. 98-3004-CIV, 2001 U.S. Dist. LEXIS 12876, at *21-*22 (S.D. Fla. May 8, 2001) (citing *Rosen* and dispensing with notice in a class action); Peter J. Romeo & Alan L. Dye, Section 16 Deskbook 418-19 (Spring 2011) (discussing *Rosen*).

Dispensing with shareholder notice is consistent with the text of Rule 23.1(c), which requires that "[n]otice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members *in the manner that the court orders*" (emphasis added).  Courts have held that Fed. R. Civ. P. 23(e)'s similar language — requiring notice "in such manner as the court directs" — is "'sufficiently flexible' to permit a court 'to determine that no notice at all is required.'"  *Access Now*, 2001 U.S. Dist. LEXIS 12876, at *21 (quoting *Larkin Gen. Hosp. v. Am. Tel. & Tel. Co.*, 93 F.R.D. 497, 502 (E.D. Pa. 1982), and citing *Doe v. Perales*, 782 F. Supp. 201, 206 (W.D.N.Y. 1991)); *see also Green v. Am. Express Co.*, 200 F.R.D. 211, 212 & n.1 (S.D.N.Y. 2001) (discussing circumstances in which notice under Rule 23(e) is unnecessary).  If a court may, under appropriate circumstances, dispense with notice of a settlement to certified class members under Rule 23, and dispense with notice of the settlement of a derivative action to corporate shareholders under Rule 23.1(c), then perforce this Court has the discretion and flexibility to dispense with notice to shareholders with respect to the settlement of an action

under Section 16(b), especially since Section 16(b) does not contain any express notice requirement similar to the ones found in Rules 23 or 23.1.

## III.  ASSUMING THE *GRINNELL* FACTORS APPLY, THEY SUPPORT THE FAIRNESS, ADEQUACY, AND REASONABLENESS OF THE SETTLEMENT

The Settlement Agreement would satisfy the criteria for approval of a settlement even if the litigation were subject to Rule 23.1.  Rule 23 provides that a class action may not be settled unless the court finds the settlement "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2). In *City of Detroit v. Grinnell Corp.*, the Second Circuit described the factors a court should consider in making this determination:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also In re IPO Sec. Litig.*, 260 F.R.D. 81, 88 (S.D.N.Y. 2009) (Scheindlin, J.) (quoting the *Grinnell* factors).

In addition to the factors listed above, the *Grinnell* inquiry has a separate but related procedural component, which looks to "the negotiating process leading to settlement."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *see also Polar Intl. Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 112 (S.D.N.Y. 1999) (Scheindlin, J.) (referring to this as the "second prong" of the analysis).  The Court should satisfy itself that negotiations were "conducted at arm's length, and [that] class counsel have engaged in sufficient discovery of the claims."  *Id.* at 118; *see also Grinnell*, 495 F.2d at 465-66 (evaluating the procedural fairness and adequacy of settlement negotiations).  "'A presumption of fairness, adequacy, and

reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *In re IPO Sec. Litig.*, 260 F.R.D. at 87 (quoting *Wal-Mart Stores*, 396 F.3d at 116).

Although the *Grinnell* factors are geared toward class action settlements, this Court has applied them to a handful of cases under Section 16(b). In so doing, the Court has modified the factors in two respects. First, the Court has eliminated the sixth factor, which relates to the risk of maintaining the class action through the trial. *See, e.g.*, *FTR Consulting Group*, No. 02 Civ. 8608 (RMB), 2005 U.S. Dist. LEXIS 20013, at *6-*7 & n.2. Second, the Court has fashioned an additional factor, which looks to "the congressional purpose to cause disgorgement of short-swing trading profits by corporate insiders in favor of the corporation of which they are fiduciaries." *Id.* at *7 (quoting *GE Capital*, 2001 U.S. Dist. LEXIS 13099, at *18-*19).

In applying the *Grinnell* factors, the Court should remain mindful that "[p]ublic policy, of course, favors settlement." *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302 (SWK), 2006 U.S. Dist. LEXIS 63260, at *7 (S.D.N.Y. Sept. 6, 2006) (citing *In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 291 (S.D.N.Y. 1996)); *see also In re IPO Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) (Scheindlin, J.) ("[I]t is axiomatic that the law encourages settlement of disputes.") (quoting *Bano v. Union Carbide Corp.*, 273 F.3d 120, 129 (2d Cir. 2001) (alteration added)). Thus, while the Court should conduct an "'independent evaluation'" of the parties' settlement, it must "'stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.'" *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 329 & n.72 (S.D.N.Y. 2005) (Scheindlin, J.) (quoting *Grinnell*, 495 F.2d at 462); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575-76 (S.D.N.Y. 2008) ("[T]he court should not substitute its judgment for those of the parties who negotiated the settlement . . . .").

### A. The Negotiating Process Entitles the Stipulation of Settlement to a Presumption of Fairness, Adequacy, and Reasonableness

The parties' settlement easily satisfies the procedural component of the *Grinnell* analysis. The parties, over a period of ten months, discussed legal and factual issues, brought and defended a motion to dismiss and arrived at the settlement now before the court.

Among counsel for MONECOR was Peter Romeo, whose co-authored treatise, *Section 16 Treatise and Reporting Guide* is likely on the Court's chambers bookshelf. No slighting of the reputations and abilities of other distinguished counsel for MONECOR or for ICONIX is intended. The qualifications and reputation of Mr. Lopez, appearing for Plaintiff, in Section 16(b) litigation are reported in the Fourth Edition at pages 870-871 of Mr. Romeo's treatise. Miriam Tauber is a former Skadden Arps associate with considerable experience in complex litigation and in Section 16(b) matters.

Both sides were ably represented by attorneys who are among the foremost in the specialized field of short-swing trading, who analyzed and bargained to the peak of their abilities and responsibilities.

### B. The Terms of the Settlement Agreement Satisfy the Substantive *Grinnell* Factors

#### 1. *Grinnell* Factor One: The Complexity, Expense, and Likely Duration of Litigation

All counsel, defense, Plaintiff's and ICONIX's, vouch for the complexity of the legal and factual issues present in this case.

MONECOR, during the trading period alleged, did not file any Forms 3 or 4 or Schedule 13D reporting its trading activities in shares of ICONIX. MONECOR is a licensed broker-dealer in the United Kingdom. It is not a broker-dealer licensed in the United States. Among its specialties is the writing of over-the-counter "Contracts for Difference" ("CFDs"), a form of

derivative instrument which may only legally be sold in the United States or to United States persons if traded on a national securities exchange. Basically, a CFD is an agreement in which the writer agrees with its counterparty to pay to that counterparty any increase in the value of an underlying security from date of inception to date of termination; and the counterparty, should the price change go against it, to pay that difference to the writer.

Plaintiff alleges that beginning in January 2016, MONECOR began writing CFDs for its counterparty, Sports Direct International PLC ("SPORTS DIRECT"), a U.K. corporation organized under the laws of Wales, with respect to ICONIX common stock. Plaintiff further alleges that MONECOR hedged its paper by buying or selling shares of ICONIX on the NASDAQ Stock Exchange in New York City with each writing or termination. According to Plaintiff, it is this hedging activity that Plaintiff identified in this suit as short-swing trading. Identifying the transactions engaged in by MONECOR was made extremely difficult for an outsider because MONECOR did not identify itself by a Schedule 13D filing as a market participant in shares of ICONIX common stock.

Plaintiff's counsel had been following the Schedule 13D filings of SPORTS DIRECT since July of 2017. However, since a CFD confers only an economic interest on its purchaser and not voting or dispositive powers, Plaintiff posits that it is unlikely that a CFD represents beneficial ownership of any referenced shares. Plaintiff asserts that in and out trading in CFDs probably does not fall within the ambit of Section 16(b). Plaintiff's counsel were able to create mirror-image trading pictures of MONECOR's activity by looking to SPORTS DIRECT's purchases and sales and treating them as indicators of MONECOR's hedging. Demand for recovery of MONECOR's trading profits was made on ICONIX on October 26, 2017 and sixty days later, on December 26, 2017, suit was filed.

One of the principal defenses of MONECOR is that the market-maker exemption of Rule 16(d) exempts MONECOR. A discussion of this defense appears at pages 15 and 16, *infra*.

If litigated to a conclusion this is easily a multi-year and very expensive case.

### 2. *Grinnell* Factor Three: The Stage of the Proceedings and Extent of Discovery

"This factor is aimed at ensuring that the parties have a 'thorough understanding of their case' prior to settlement." *In re IPO Sec. Litig.*, 260 F.R.D. at 114 (Scheindlin, J.) (quoting *Wal-Mart Stores*, 396 F.3d at 118). The amount of discovery necessary to assess a case depends on how fact-dependent it is, so the courts have refused to fix a hard threshold for acceptable discovery. To the contrary, they have said repeatedly that a *Grinnell*-compliant settlement can occur even before formal discovery has begun. *See, e.g.*, *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004); *In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2012 U.S. Dist. LEXIS 86513, at *35 (S.D.N.Y. June 20, 2012); *see also In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 U.S. Dist. LEXIS 36093, at *20 (S.D.N.Y. May 1, 2008) (collecting cases). The courts ask only for "a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 364 (S.D.N.Y. 2002).

The principal factual discovery required for this case to be settled was confirmation of the trading records of MONECOR. Plaintiff's counsel regard this as a mere formality. Running a CFD book without contemporaneous hedging would be incompetent and the only variations from the tabulations made by counsel might be inconsequential variations of date and time of transactions, none likely to affect the outcome. Such additional claims as MONECOR's counsel

have made in their pending motion to dismiss have been considered by Plaintiff's counsel and have given them comfort in relying on their prior understanding.

All discovery necessary to address the legal issues has been conducted. It is the legal issues applicable to the facts so established that present difficulties. It is they that have impelled pragmatic settlement negotiations.

### 3.  *Grinnell* Factors Four and Five: The Risks of Establishing Liability and Damages

Liability or the lack of liability is dependent upon, among other things, the validity of MONECOR's assertion of the market-maker exemption of Rule 16(d). It is claimed that purchases and sales on a national securities exchange in the United State were incident to the making of a CFD market in the United Kingdom.

Plaintiff's positions are that Rule 16(d) could not have been contemplated by the SEC to cover hedging activity in an-over-the-counter market that would be illegal in the United States. Purchases and sales on a United States registered securities exchange, which NASDAQ is, cannot fall within the exemption of Rule 16(d) if the claim for exemption is market-making activity directly in those shares because Rule 16(d), by its express terms, applies only to securities not trading on a national exchange.

Plaintiff also contends that what MONECOR was doing was not market-making but rather engaging in the writing of bespoke contracts akin to a bookie taking bets. The instruments created by MONECOR were not traded among non-parties, nor were bid and asked prices quoted to persons not in privity. The cases dealing with cash settled equity swaps are most apposite and none has ever found a face-to-face writing of contracts limited to the two parties in privity to be market-making activity insulating securities bought and sold as hedges from short-swing liability.

MONECOR vigorously disagrees with Plaintiff's position on this point and believes that there is caselaw, including in the Second Circuit, that supports its position regarding the market maker exemption.

The competing views may just possibly be biased by the distortions of zealous advocacy but there, in a nutshell, are the two issues which will decide the case should this settlement not be approved.

4. ***Grinnell* Factors Eight and Nine: The Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of All the Attendant Risks of Litigation**

The proposed recovery of $350,000 amounts to approximately 10% of the maximum recoverable short-swing profits sought in the Complaint, an acceptable achievement by the standards of securities litigation. In its most recent survey, Cornerstone Research found that, in cases with estimated damages of less than $50 million (the lowest range for which Cornerstone disaggregates data), the median settlement recovered only 10.3% of estimated damages.[2] When all cases are considered, that figure falls to 2.1%. *See id.* Cornerstone's sample is limited to securities fraud cases, *see id.* at 21, which offer defenses not available under the strict liability of Section 16(b). Still, the stark difference between the percentage recovery in this case and in securities litigation generally implies that the Settlement Agreement at least falls within the "range of reasonableness."

---

[2] *See* Ellen M. Ryan & Laura E. Simmons, Cornerstone Research, Securities Class Action Settlements: 2011 Review and Analysis 7 (2012), *available at* http://www.cornerstone.com/files/Publications/a0e54ba8-2830-4cc00-9481108208ec4ed8/Presentations/Publication_Attachment/f03e4174-ec8a-4eb3-ba22-19bd5162f09e/Cornerstone_Research_Settlements_2011_Analysis.pdf; *see also In re Veeco Instruments Sec. Litig.* No. 05 MD-La 1695 (CM), 2007 U.S. Dist. LEXIS 85629, at *34*35(S.D.N.Y Nov. 7, 2007).

### 5. *Grinnell* Factor Seven: The Ability of the Defendants to Withstand a Greater Judgment

ICONIX stands to recover at most $3.64 million in this case on Plaintiff's most optimistic hopes. MONECOR, although private and non-reporting, could likely weather that liability. But the size of Defendant's wallet is not a measure in this case of what may reasonably be sought by Plaintiff. The case's validity is the true measure of what is reasonably due once the solvency of MONECOR is out of the picture. Ability to pay is not and was not a consideration in the settlement agreed in this case.

### 6. The Congressional Purpose to Cause Disgorgement of Short-Swing Trading Profits

This factor only applies to Section 16(b) settlements. The c ourts added it to the mix in *Levy v. GE Capital Corp.*, No. 99 Civ. 10560 (AKH), 2001 U.S. Dist. LEXIS 13099, at **18-19 (S.D.N.Y. Aug. 30, 2001). Judge Hellerstein, who wrote the opinion in *GE Capital*, did not explain how to apply this factor, though he described it as having "considerable importance." *Id.* at *18. His opinion suggests that the court was concerned about settlements (including the one before him) that provided only non-pecuniary benefits. *See, e.g., id.* at *24 (rejecting the "intangible values" of the settlement and opining that "[t]he settlement proffered to me has not been shown to create one dollar of real value").

That view makes sense given the Congressional purpose behind Section 16(b) of preventing the unfair use of information which may have been obtained by [an insider] by reason of relationship to the issuer." 15 U.S.C. § 78p(b). This deterrent would be disserved if insiders could disgorge short-swing profit in the form of "coupons" or similar non-pecuniary assets.

That is not a concern with the settlement negotiated by the parties here. Unlike the deal in *GE Capital*, the Settlement Agreement gives the issuer the most real and tangible of benefits: cash. Moreover, Plaintiff's attorneys are not taking "better care of [themselves] . . . than those

[they] represent[]." *GE Capital*, 2001 U.S. Dist. LEXIS at *26 n.16. The agreement provides that attorney's fees are paid only after, and out of the disgorgement.

## IV.     THE LEGAL FEES AND DISBURSEMENTS AGREED TO ARE FAIR AND REASONABLE

ICONIX has agreed that Plaintiff's counsel, who discovered this case and litigated it on a contingent basis, have provided a real and measurable benefit to ICONIX which has resulted in a proposed payment of $350,000. In negotiations conducted after settlement ICONIX agreed to support Plaintiff's requested counsel fees of $87,500, plus disbursements of $1,026 (not including the cost of shareholder notice should that be required). That amount is 25% of the recovery and payable directly by MONECOR from the gross settlement. It is well within the range of fees routinely awarded in common fund cases in this Circuit and elsewhere. *See In re Warner Comms. Sec. Litig.*, 618 F. Supp. 735 (S.D.N.Y. 1985) where Judge Keenan noted that fee awards in this district and others are generally between 20% and 50% of the common fund.[3]

### A.     The Agreement Between Plaintiff's Counsel and Iconix Should Be Given Great Deference

The negotiation at arms-length of Plaintiff's fees after settlement was a common-sense attempt to have the persons closest in knowledge to the proceedings have a go at resolution of this last aspect of the case. The Second Circuit has cautioned that the courts should be hesitant

---

[3] A small sampling of fee decisions in the district includes: *Krome v. Merrill Lynch & Co.,* 85 Civ. 765 (DNE) (S.D.N.Y. May 7, 1991) (Edelstein, J.) (court awarded 33%); *In re Gulf Oil/Cities Service Tender Offer Litig.*, 142 F.R.D. 588 (S.D.N.Y.) 1992 (court awarded 30% of a $34 million settlement fund finding the fee requested to be "eminently reasonable"); *In re Allister Ins. Sec. Litig.,* 88 Civ. 9282 (PKL) 12991 U.S. Dist LEXIS 20402 (S.D.N.Y. Nov. 20, 1991) (Leisure, J. 35%); *Bello v. Integrated Resources, Inc.,* [1990-1991 Transfer Binder) Fed. Sec. L. Rep] (CCH) Par. 95,731 (S.D.N.Y. 1990 (Haight, J. 30%); *In re N.Y. City Mun. Sec. Litig.,* [1984 Transfer Binder] Fed. Sec. L. Rep (CCH) Par. 91,419 (S.D.N.Y. 1984) (Owen, J. 30%); *Schaffer v. Soros,* 1994 WL 381442 (S.D.N.Y. 1994 McKenna, J.) (awarding 33 1/3 of 7.9 million settlement of a Section 16(b) case); *Adair v .Bristol Tech. Sys., Inc.,* 97 Civ. 5874 (S.D.N.Y. Order dated Nov. 12, 1999) (Sweet, J. 33 1/3 of $975,000 settlement)

to interfere in fee arrangements between plaintiffs and defendants in shareholder actions when defendants have agreed not to oppose  or by extension, agreed to support  the payment of stipulated fees:

> [W]here ... the amount of the fees is important to the party paying them, as well as to the attorney recipient, it seems to the author of this opinion that an agreement "not to oppose" an application for fees up to a point is essential to the completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged.  It is difficult to see how this could be left entirely to the court for determination after settlement.

> *Malchman v. Davis*, 761 F.2d 891, 905 n.5 (2d Cir. 1985).

> *See also Evans v. Jeff D.*, 475 U.S. 717, 738 n.28 (1986) (citing *Court Awarded Attorney's Fees,* Report of the Third Circuit Task Force, 108 F.R.D. 237, 267 (1985); *In re Quest Software, Inc. Deriv. Litig.*, No. SA-CV-06-763, Order Granting Final Approval of Settlement, at 6 (C.D. Cal, Aug. 15, 2008) ("... a stipulated fee is entitled to considerable deference" and "judicial meddling in stipulated fee agreements is dangerous and discourages settlements")).

MONECOR goes beyond "not opposing" the requested fee.  It has stipulated to "support" this application (*see* Settlement Stip. ¶ 6, ECF No. 41).

## B.    Applicable Standards

A request for attorneys' fees in a successful shareholder suit is assessed by applying a handful of factors, unevenly weighted as circumstances warrant.

### 1.    Benefit Conferred

Of all factors relevant, Plaintiff urges that the benefit conferred – objectively measurable in this case by dollars to be recovered – should weigh most heavily in a case solely about the recovery of money damages in a windfall setting.  ICONIX suffered no actual damage for which it is being compensated.  Rather, as in all Section 16(b) cases, it is the gratuitous recipient of a statutory forfeiture intended to protect the integrity of the marketplace for publicly traded

securities. This is found money and the plaintiffs are the finders. "The most important factor in determining the reasonableness of a fee is the degree of success obtained." *Pino v. Pocasio*, 101 F.3d 285 (2d Cir. 1996).

The settlement provides for a recovery from MONECOR aggregating $350,000. It is all cash. There are no difficult-to-value assets, no coupons, no rights or intangibles whose worth are matters for subjective evaluation.

Here, through the negotiation at arms-length of a fixed percentage fee after the amount of settlement had been fixed, a firm dollar amount has been agreed. It well within the "custom and practice" of the District. Its reasonableness is a tribute to the skill of counsel on ICONIX's behalf and to the willingness of Plaintiff's counsel to see the litigation come to a speedy conclusion.

## 2. Contingent Nature of the Fee and Risks of Litigation

The contingent nature of the fee and the risks of having Plaintiff's counsel be left empty-handed at the end of litigation is a significant factor in assessing this application. "Perhaps the foremost of [all] factors is the attorney's 'risk of litigation,' i.e. the fact that despite the most vigorous and competent efforts, success is never guaranteed." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974). *See also In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987). "[A] multiplier takes into account the realities of legal practice by rewarding counsel for those successful cases in which the probability of success was slight yet the time invested in the case was substantial." *Id.*

We divert into the thoughts expressed by the New York State Court of Appeals, not as controlling precedent but as a common-sense discussion of the topic. In *Lawrence v. Graubard Miller*, 11 N.Y.3d 588 (N.Y. 2008), it wrote:

> [It] is not unconscionable for an attorney [retained on contingency] to recover much more than he or she could possible have earned at an hourly rate [and if] courts become too preoccupied with the ratio of fees to hours, contingency fee lawyers may run up hours just to justify their fees, or may lose interest in getting the largest possible recoveries for their clients.

*Id.*

The risks of not being able to overcome the putative defenses of MONECOR—some of which have been discussed in this brief—would leave ICONIX and Plaintiff's counsel uncompensated.

**3.     Magnitude and Complexity of the Action**

In order to avoid redundancy plaintiffs respectfully refer the Court to our earlier comments for a discussion of the complexity and magnitude of the case and to the fact that all counsel involved will testify, if called upon, to the knotty problems raised by the facts and law of the case.

**4.     Quality of Representation**

Quality of representation, *i.e.*, the demonstrated competence of counsel, is a salient consideration. *Grinnell, supra* at 471; *Union Carbide,* 724 F. Supp. at 163.

Romeo and Dye (yes, that Romeo), in their *Section 16 Treatise,* their *Section 16 Handbook,* in their newsletter and in their lectures have described David Lopez, from time to time, as "pre-eminent in the field." I am an honors graduate of Cornell University (1963) and of Columbia Law School (1966) and have litigated shareholder suits as a member of the bar of this court since 1970. I am a member, in addition, of the bars of the State of New York, of the U.S. District Courts for the Eastern, Western and Northern Districts of New York and of the Districts of Vermont and Colorado and have been admitted *pro hac vice* to the bars of approximately 25

U.S district courts.  I am a member of the bars of the First, Second, Third, Fifth, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits and of the Supreme Court of the United States.

Miriam Tauber is a *summa cum laude* and Phi Beta Kappa graduate of the University of Pennsylvania and of the University of Pennsylvania School of Law.  She is a former senior litigation associate at Skadden Arps Slate Meagher & Flom LLP with much experience in complex litigation.  She is a member of the bars of the State of New York, the Second Circuit, the Southern and Eastern Districts of New York, the Western District of Texas and has been admitted *pro hac vice* to eight Federal District Court bars.

The celerity with which this case has progressed from demand to suit to the settlement now before the court speaks volumes for the clarity of the analysis of Plaintiff's counsel.  Prior to settlement, the Court has not been burdened with the need to intervene.

Plaintiff's counsel submit that their competence has met the test of adequacy.

### 5.        The Lodestar Approach

It is the central thesis of this application that the *Lodestar* approach (hours spent multiplied by an hourly rate), in the circumstances of this case, should be given slight weight. "The critical inquiry when reviewing hours billed to the common fund ... is whether the work performed resulted in a benefit ...." *Agent Orange Prod. Liab.*, 818 F.2d at 237.

In *Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992), Judge Posner reversed the trial court's *Lodestar* award and criticized the judicial attempt to set a value on lawyer services mechanistically:

> It is apparent what the district judge's mistake was. He though he knew
> the value of the class lawyer's legal services better than the market did ....
> He may have been right in some ethical or philosophical sense of 'value'
> but it is not the function of judges in fee litigation to determine the
> equivalent of the medieval just price. It is to determine what the lawyer
> would receive if he were selling his services in the market rather than

being paid by court order.

*Id*. at 568.

It is inappropriate "to determine the value of a service that the market has set its own value on" by reference to hourly rates, and it is error not to award a premium "in order to reflect the risky character" of a representative action. *Id.* at 569. The virtue of negotiation of a fair fee by the paying party and the receiving party is that "[m]arkets know market values better than judges do." *Id.* at 570.

The requested fee has, indeed, been set by the market, a market consisting of ICONIX as sole purchaser of services in the circumstances. ICONIX has struck a bargain with Plaintiff's counsel after careful and adversarial negotiations, informed by the familiarity of ICONIX's counsel with all case events, and the mediation of counsel to MONECOR including special counsel, Dennis Tracey and Peter Romeo of Hogan Lovells, LLP.

The 254.45 hours expended by Plaintiff's counsel collectively on both this case and on *Donoghue v. Finish Line, Inc.*, 17-cv-8708 (AJN), a companion case being settled simultaneously, multiplied by their respective non-contingent hourly rates, ranging from $450 to $950, yield a so-called *lodestar* of $201,002. The collective agreed fee (from both this action and the *Finish Line* action referred to above) is roughly 1.15 times the *lodestar* and the allocation of fees between FINISH LINE and ICONIX was a matter negotiated between the respective parties. The use of a substantial multiplier to achieve a just result has ample precedent.[4] This

---

[4] *In re Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.* 778 F.2d 890 (1st Cir. 1985) (multiplier of 6); *Weiss v. Mercedes Benz Inc.*, 899 F. Supp. 1297 (D.N.J. 1995) (multiplier of 9.23); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181 (D. Mass. 1998) (multiplier of 8.9); *In re Beverly Hills Litig.*, 639 F. Supp. 915 (E.D. Ky. 1986) (multiplier of 5).

multiplier is 1.15x and is reflective of the fact that the fees in the two cases were, in fact, negotiated as percentages of recovery, not a count of hours.

6.      **Public Policy**

The statute under which this suit has been brought is an expression of a public policy against short-swing trading and the possible use of inside information to trade against a less-well-informed public.  It has withstood, in the words of Professor Louis Loss, "a hearty detestation" among those of the sporting gentry subject to it for the 84 years of its existence.

The Congress has revisited the statute's utility and method of enforcement several times during its lifetime, aided by Securities & Exchange Commission studies and recommendation, and each time it has ratified it through tweaking and expansion, not by repeal.

This action is based on the law.  It is clearly within it.  It is brought in the manner and for the purposes Congress intended.  And it advances the public policy that the statute was intended to embody.

## CONCLUSION

The settlement before the Court is an excellent resolution of a somewhat complex case raising many unprecedented issues.  It has been resolved through exploration and negotiation among leading practitioners in the field collegially and without acrimony.  The efforts of Plaintiff's counsel, for which payment in an agreed amount is sought, produced an outstanding result with a speed unusual in securities litigation and with little burden on the Court.  It is fully supported by ICONIX, the beneficiary of Plaintiffs' efforts, and even by MONECOR.  The settlement should be approved and the agreed fees awarded.

Dated:  September 7, 2018
       Southampton, New York

                                 /s/ *David Lopez*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2018 I caused a true and correct copy of the foregoing Memorandum of Law in Support of Settlement Approval and Attorneys' Fee Award to be served on each person who has appeared as counsel by filing the same through the Court's CM/ECF system.

Dated: September 7, 2018
      Southampton, New York

                                    /s/  *David Lopez*